IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

United States of America,

          Plaintiff,

          vs.                      Case No. 14-10199-JTM

Andris Cukurs,

          Defendant.

MEMORANDUM AND ORDER

This case arises from a traffic stop on Interstate 70, in which the defendant Andris Cukurs was found to be driving a vehicle containing a large amount of marijuana. The defendant has filed separate motions to suppress the roadside search of the vehicle following an alert by a service dog, and to suppress the subsequent court-authorized search of the cell phones and laptop computer taken from the vehicle.

The court conducted an evidentiary hearing, which established that Cukurs' black Chevrolet Suburban was stopped by Dickinson County Sheriff's Department Deputy Kalen Robison on November 14, 2014, at about 2:20 p.m. Deputy Robison watched the Suburban as it traveled on I-70 within Dickinson County, Kansas, and saw the car weave outside its lane on multiple occasions.

Deputy Robison told dispatch that he would be stopping the Suburban for the lane violation. He also reported the Suburban's tag as a Florida tag, BJOO97. The tag for the vehicle is actually BJQQ97. The BJOO97 tag is listed as issued to a vehicle of different make and model, a red 1969 Ford.

Deputy Robison's stop of the vehicle is recorded on video from two cameras in the patrol car. The first faces forward, the second is centered on the passenger seat of Robison's patrol car.

From the video evidence and Deputy Robison's credible testimony, the court finds that Cukurs' vehicle was weaving in a manner indicative of a driver who was sleepy or incapacitated. The vehicle strayed onto the centerline on one or more occasions, and the Deputy noticed other vehicles behind "slowed way down" to avoid the Suburban. Deputy Robison turned on his video recorder, and the resulting video shows the Suburban drifting on and off the fog line several times. There were no weather or road conditions which would cause such movements.

Deputy Robison activated his lights, and pulled the Suburban over. His purpose in stopping the car was to investigate the driver's weaving. Deputy Robison explicitly notified the dispatcher of his reason for the stop.

When the vehicle stopped, Robison approached to speak with the driver, defendant Cukurs, on the passenger side of the Suburban. Robison looked through the back window as he passed the Suburban. Cukurs lowered the passenger window, and the deputy immediately identified several indicators of criminal activity. First and foremost, Robison

2

smelled marijuana from inside the car. The Suburban had a lived-in look, and a lot of clothing and trash was visible. There were also multiple cell phones and food bags present, along with a cooler with fruit and grocery store food. Finally, Robison noted multiple masking agents, in the form of air freshener spray, which is commonly used to cover up the odor of narcotics.

In a short colloquy speaking through the passenger window, Deputy Robison stated that he had checked the tag, which "comes back to an older car," and asked if this was Cukurs' car. Cukurs stated that it was a rental car, and that he was taking the car back to Denver. Deputy Robison asked if Cukurs worked for the rental company, and Cukurs explained that he actually lived in California, and that he was returning the car to Denver, and that "I am staying with some friends there." Cukurs identified himself with a California driver's license. Deputy Robison told Cukurs, "Ok. Go ahead and come back here and I'll get a warning cut out."

Deputy Robison asked Cukurs to sit in his patrol car, while he completed the warning citation. While he was filling out the citation, Robison asked Cukurs about his travel plans.  According to Deputy Robison, Cukurs was extremely nervous during this conversation, and gave inconsistent answers to various questions.

Cukurs generally explained that he lives in Glendale, California, and that he had ridden to Denver on November 2 or 3, 2014, with a married couple. These persons were old friends, but he did not name them. He rented the car on November 6, arrived in Milwaukee on November 9 or 10, and left Milwaukee on November 12.

3

Cukurs stated that he himself owns three cars, but he did not use them because he "didn't want to put the miles on them."

Cukurs said he had traveled to Milwaukee to help his sister move to another house.

At approximately 2:30 pm, Dickinson County Sheriff Department Deputies Braden Hurt and Farris arrived. Robison exited his patrol car and told Deputy Hurt that Cukurs had stated that he had "hitched a ride with some unknown people from California," and that Cukurs "went to Milwaukee, Wisconsin, er Green Bay Wisconsin for two days."[1]

A police service dog from the second patrol car conducted a free air sniff around the Suburban. The dog quickly alerted near the rear hatch area.

Robison returned to his vehicle and asked Cukurs if there was anything illegal in the car. Robison asked if they could search the vehicle, and Cukurs refused. Robison then returned Cukurs's documents. He also asked about the presence of illegal narcotics in the car. Cukurs responded "no." When asked about the presence of currency in excess of $5,000.00, Cukurs paused, looked away from the deputy and stated "no."

Robison and Farris then searched the Suburban, and found a significant amount of United States currency, a quantity of marijuana, a marijuana smoking device, a ledger, numerous receipts, two cell phones and a laptop computer.

---

[1] The defendant argues that these statements by Deputy Robison, about riding with "unknown people," were misleading because Cukurs had actually explained to Robison that he had driven to Colorado with old friends, and that he had gone to Wisconsin to visit his sister. The court finds no substantial inconsistency, and as noted earlier, finds Deputy Robison to be a credible witness. The Deputy's comment can be read simply as indicating the friends were unknown to *Robison*, not that they were unknown to *Cukurs*.

Deputy Robison told Deputy Hurt to place Cukurs under arrest for possession of drug proceeds. Cukurs was handcuffed and read his Miranda rights. Cukurs indicated he understood his rights.

Deputy Hurt asked Cukurs who the money belonged to. Cukurs said, "I don't know." Asked about how much money was in the car, Cukurs said, "you read me my rights and I don't want to talk."

Cukurs was placed in the deputy's car and eventually taken to the county jail.

On November 17, 2014, a state court judge issued a search warrant for the two cell phones and laptop found inside the Suburban.


**A. Motion to Suppress Vehicle Search**

**Failure to Maintain a Single Lane of Traffic**

Deputy Robison initially stopped the Suburban for an apparent violation of K.S.A. 8-1522(a), which requires that a motorist drive "as nearly as practicable within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." The statute actually creates "two separate rules of the road," and is violated if a motorist fails to maintain a single lane where practicable, *or* changes lanes unsafely. *State v. Marx*, 289 Kan. 657, 215 P.3d 601 (2009). The first rule does not require proof the lane violation was unsafe, but does require a showing of practicability:

K.S.A. 8–1522(a) is not a strict liability offense. The express language

employed—"as nearly as practicable"—contradicts the notion that any and all intrusions upon the marker lines of the chosen travel lane constitute a violation. [O]ne can conjure up a number of scenarios where maintaining the integrity of the lane dividing lines is impracticable, *e.g.*, weather conditions or obstacles in the roadway. However, the statute even dilutes the practicability standard. It does not say "when practicable" a vehicle will be driven entirely within a single lane. It only requires compliance with the single lane rule as *nearly* as practicable, *i.e.*, compliance that is close to that which is feasible. That statutory language tells us that a violation of K.S.A. 8–1522(a) requires more than an incidental and minimal lane breach.

*Id*. at 674 (citations omitted, emphasis in original).

The defendant argues that Deputy Robison could not have properly stopped his vehicle because it never actually *crossed* either the centerline or the fog line. (Dkt. 19, at 7).

The court finds that Deputy Robison had reasonable suspicion for stopping Cukurs' car. The video establishes that the Suburban crosses onto, if not actually over, the fog line on three separate occasions. Further, the Deputy testified that the Suburban had crossed onto the center line before he started the video, and was driving in a manner that caused other vehicles to take precautionary action. There were no weather conditions causing such driving – the day was sunny and bright, and the video establishes that the winds were not so strong as to interfere with vehicle control. There were no obstacles in the road. The traffic stop was not unreasonable.

**Reasonable Mistake**

Police officers are entitled to conduct limited intrusions upon the freedom of citizens premised on a reasonable mistake of fact. *See Heien v. North Carolina* __ U.S. __, 135 S. Ct.

530 (2014); *United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996). Here, Cukurs'
contends that Deputy Robison's report of the Florida license plate number *cannot* be a
reasonable mistake under the facts of the case.[2] Cukurs stresses that "Deputy Robison did
not double check the license plate" when he passed by it on his way to speak with the
driver of the Suburban, and that "[i]f he had bothered to glance at the rental agreement, the
deputy would have seen that the tag number listed was BJQQ97." (Dkt. 19, at 10).

The court does not find that the mistake was not that of a reasonable person. From
the court's review of the video and photographic evidence, Florida's  Q's do indeed look
a lot like O's. Moreover, the Suburban is backlit in relatively bright afternoon sunshine. The
vehicles were being driven at a high rate of speed on an interstate highway. A reasonable
person could see those Q's as O's. More importantly, the defendant's argument — that
Robison acted unreasonably in failing to question his initial assumption — rests on a
general implication of bad faith on the part of the Deputy. The court finds this assumption
mistaken. Rather, the court finds the Deputy made the original and good faith conclusion
that the Q's were O's, and thus he would have no reason to second guess that assumption,
especially given that the deputy had an independent reason for stopping the Suburban
under Kansas law.

**Search of the Vehicle**

---

[2] The defendant states that "[u]nless further evidence becomes available," he "is
willing to set aside the fact that Deputy Robison may have intentionally called in the
wrong tag to manufacture reasonable suspicion for a car stop." (Dkt. 19, at 8).

The defendant maintains that the government cannot rely on Deputy Robison's smell of marijuana because his action of leaning into the Suburban was itself a search requiring probable cause or reasonable suspicion. The authorities supplied by the defendant, however, do not support such a conclusion under the facts of the case.

The defendant first relies on an observation by the Fifth Circuit in *United States v. Ryles*, 988 F.2d 13, 15 (5th Cir. 1993), which arose after an officer conducting a traffic stop stated that he smelled marijuana within the defendant's van. The defendant in *Ryles* passed a field sobriety test, but did not have a valid driver's license. The defendant stated that one of the passengers in the van might have a valid license, and the officer "approached the van" and "[a]most immediately after he reached the driver's door, he smelled burnt marijuana." The district court made no factual finding as to whether the officer was actually physically inside the van when he detected the odor. The court of appeals rejected the government's initial argument that even if a physical intrusion occurred, it would not be a search for constitutional purposes. In language relied on by the defendant, the Fifth Circuit wrote:

> We disagree with the Government that Washington's action did not constitute a "search" for Fourth Amendment purposes. Irrespective of when he smelled the marijuana, Washington, without a search warrant, intruded inside a space that, under most circumstances, is protected by a legitimate expectation of privacy. *See United States v. Pierre*, 958 F.2d 1304 (5th Cir.1992) (*en banc*); *cf. United States v. Lovell*, 849 F.2d 910, 913 (5th Cir.1988) (airspace around luggage transported on common carrier not protected zone of privacy under Fourth Amendment). Although there is generally a diminished privacy interest in an automobile, as opposed to a residence, *see, e.g., Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), a driver or car owner does not abandon all expectations of privacy.

*Id.* at 15.

However, it must be noted that the Fifth Circuit upheld the search, explicitly rejecting the defendant's argument that the case should be remanded for a factual finding as to the exact physical location of the officer's nose at the instant of smelling the marijuana. This is because the court held that the defendant's expectation of privacy in the vehicle was sufficiently attenuated that the officer's partial presence inside would not be unreasonable:

> In the particular factual context of the instant case, we do not believe that Trooper Washington would have been unreasonable either in placing his head inside the interior of the van through an open window or in opening the driver's door and placing his torso inside, even assuming he did not smell marijuana before the intrusion. Our conclusion is based on the reason behind Washington's actions. After pulling over a van in the wee hours of the morning on a relatively deserted Texas highway, Washington was immediately approached by the driver, who smelled of alcohol and admitted that he had no driver's license. Even though Ryles was not intoxicated, he still could not lawfully drive the van. At the Ryles' own suggestion, Washington approached the van to inquire whether anyone else in the van was licensed and could drive the vehicle away. Although he did not say so at the suppression hearing, we believe that Washington would have considered it necessary to determine whether the passenger who would ultimately be driving the van was impaired by alcohol-since, after all, Ryles had alcohol on his breath. Even assuming that he walked up to the driver's door and opened it without knocking, Washington would only have been attempting to assure that the van would be driven safely. We can hardly say that this would have been unreasonable.

*Id.* at 16 (citation omitted).

Cukurs next relies on the Tenth Circuit's decision in *United States v. Montes-Ramos*, 2009 WL 3138866, *5 (10th Cir. Oct. 1, 2009). In that case, the court held that a "police officer's intentional act of intruding a vehicle's air space, even if by only a few inches,

9

constitutes a search within the meaning of the Fourth Amendment." The court stressed that the case "would be different if [Officer] Rodriguez had smelled marijuana *prior* to leaning into Montes-Ramos' vehicle," since such an event would be permissible under the functional equivalent of the plaint view doctrine. *Id.* (emphasis in *Montes-Ramos*).

However, it does not follow that any slight physical intrusion into the airspace of a stopped vehicle is automatically a search. The court in *Montes-Ramos* repeatedly stressed the evidence from the district court hearing which established that the officer *deliberately* leaned into the vehicle for precisely the *purpose* of smelling marijuana. After stopping the defendant's car for the improper display of a temporary car tag, and while the defendant was looking for his driver's license, the officer saw burlap-covered items hidden under a blanket.

The officer then placed his nose two inches inside the vehicle "[t]o confirm his suspicion that Montes-Ramos was transporting marijuana." *Id.* at *2. That is, as the court stressed, "[t]he sole purpose of the sniff was to determine whether there was marijuana in the back seat." *Id.* The plain smell doctrine was not applicable because the officer "did not smell marijuana prior to leaning his head into Montes-Ramos' vehicle. Instead he was suspicious Montes-Ramos might be trafficking drugs and leaned his head in '[f]or assurance.'" *Id.* at *5 (citing hearing transcript).

Thus, in *Montes-Ramos,* the court did not deal with an incidental intrusion which might occur between an officer and driver. Rather, the court dealt with a physical intrusion into the airspace of a stopped car, while the driver was still searching for his license, which

10

occurred after the officer was alerted to the likely presence of marijuana, and which was conducted *deliberately* for the purpose of trying to detect the odor of marijuana.

The evidence at the hearing in the present action establishes that Deputy Robison was interacting with Cukurs as part of a typical travel stop. The first interaction between Robison and Cukurs through the passenger window of the Suburban is relatively brief. Less than a minute elapses between Deputy Robison's first, "How you doing sir?," and his statement that Cukurs should join him in the patrol car while he wrote up the warning citation. The stop took place on the shoulder of an interstate highway, and Deputy Robison spoke with Cukurs through the passenger window for reasons of officer safety. When the Deputy reached the window, Cukurs lowered it. However, he had also lowered the driver's window, and because Robison was initially unable to hear Cukurs, he immediately asked Cukurs to raise the other window.

The Deputy leaned towards the Suburban for the purpose of hearing Cukurs, not because he had any preexisting suspicion of the presence of illegal drugs. Further, given the perspective of the video, it is not clear that Robison actually leaned into the Suburban at all. If he did, it was not by a great deal. During most of the 50 seconds or so during this first interaction, the video shows the back of the deputy's head, indicating that his head was not then within the Suburban.

The defendant also stresses that Deputy Robison looked into the rear window of the Suburban, cupping his hands and leaning close to the glass, as he approached the passenger window. This action is not suspicious in itself, rather, it would simply be

common police procedure. The Suburban's windows appear to be heavily tinted, and Robison is approaching an unknown vehicle. A brief attempt to glance inside the vehicle is certainly consistent with a concern of his own safety. Moreover, this action was not a lingering inspection, but a quick glance lasting no more than a second.

Additionally, the court does not accept the defendant's suggestion that Deputy Robison never smelled any marijuana. As noted earlier, the defendant concedes that Robison's mistake of the license plate number, at least initially, was genuine. Not so, however, for the smelling of marijuana:

> If Deputy Robison had actually smelled marijuana, he would have had justification to search the Suburban immediately. However, at no point during the traffic stop did Deputy Robison ever indicate that he had smelled marijuana. Even when he got out of his vehicle to speak with another deputy over ten minutes into the stop, Deputy Robison never mentions this alleged odor. At no point does he tell the K-9 handler that he smelled this alleged odor. At no point does he ask Mr. Cukurs about this alleged odor. And when Mr. Cukurs refused consent to search the vehicle the deputy did not say that he did not need consent because of this alleged odor.

(Dkt. 19, at 17).

The court finds the argument unpersuasive, as it is based simply on the fact that Robison did not explicitly tell the other deputies of the marijuana smell, and did not tell Cukurs. Both actions are hardly suspicious, and in fact reflect conscientious police work. In the former instance, the additional officers were conducting a canine examination, and Robison could reasonably want them to reach their own conclusions about the vehicle. And the defendant offers no reason why Robison would want to immediately alert a criminal suspect to the grounds for his suspicion.

12

In sum, the court finds that the stop of Cukurs' vehicle reflected a normal police interaction with a stopped motorist. Taking place on the shoulder of a busy interstate highway, the interaction naturally occurred through an open passenger window. The video does not indicate that Deputy Robison physically intruded into the airspace of the Suburban any substantial distance, and at this time there is no indication that at the time of that interaction the deputy was deliberately attempting intrude into that airspace to confirm a preexisting suspicion of criminal activity.

Deputy Robison had good cause for stopping the defendant's car, either on the basis of inattentive driving or the failure to maintain a single lane, or for the apparent mismatch in the license plate. The deputy's mistake as to the latter was a good faith mistake of fact. Having validly stopped the car for these potential traffic offenses, the heavy odor of marijuana provided independent reasonable suspicion for holding Cukurs and his vehicle pending the arrival and use of the drug dog.

The defendant argues that the additional factors noted by the deputy — the lived in nature of the car, the presence of air freshener, the existence of multiple cell phones — are not sufficient to create a reasonable suspicion. However, this argument largely focuses on each factor sequentially. The court finds that these factors together, along with the heavy odor of marijuana emanating from the vehicle, provided a reasonable suspicion for the continued, brief detention which preceded the deployment of the service dog.

**B. Search of the Cell Phones and Laptop**

13

The defendant offers several rationales for suppressing the search of the cell phones and laptop computer, which occurred upon a state court issued search warrant. He argues that the affidavit for warrant is defective, first, because cell phones are very common and Deputy Robison did not explain what exactly he sought to obtain. Second, the affidavit does not establish probable cause because while evidence might suggest that "Mr. Cukurs [was] acting as some sort of 'mule' ... the decades-long experience of the drug war to suggest that mules as a matter of course possess the same information as higher-level traffickers" is erroneous and in any event this was at most a "single episode of alleged criminal activity." (Dkt. 20, at 6, 7).  Finally, he argues the government's efforts to obtain the warrant cannot be justified under the good faith doctrine articulated in United States v. Leon, 468 U.S. 897 (1984).

As to his first argument, defendant relies in particular on the Supreme Court's observation in *Riley v. California*, No. 13-132 (June 25, 2014) on the ubiquitous nature of cell phones in modern society, and on Judge Waxse's recent decision to deny an application for a warrant to search a telephone in *In re Search of A Nextel Cellular Telephone*. No. 14-MJ-8005, 2014 U.S. Dist. LEXIS 88215 (D. Kan. June 26, 2014). The court finds that neither decision warrants suppression here.

While it is indeed common for many persons to have a cell phone, the fact remains that Cukurs had multiple cell phones in the Suburban at the time of his arrest, and the defendant supplies no evidence that such activity is anything other than extraordinary. The evidence from the deputy's affidavit is that drug traffickers frequently use electronic

14

communications to further their activities, and the defendant does nothing to show how this is unlikely or incorrect.

In *Nextel*, the Magistrate Judge declined to authorize a search warrant based upon concerns that the methodology for the search submitted by the government was imprecise and might collect information unrelated to the criminal investigation. But while this may have been a wise and appropriate resolution to the warrant request before him, this case is of course in an entirely different posture.

In *Nextel*, the government was free to submit a new and corrected warrant application. Here, the magistrate already issued the search warrant. Accordingly, this court views the decision to grant the warrant with great deference. *United States v. Martinez*, 764 F.2d 744, 746 (10thCir. 1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). *Nextel* is simply not controlling here. Rather, as the Tenth Circuit has observed, a "computer search may be as extensive as reasonably required to locate the items described in the warrant." *United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir. 2009).

Viewed with that required deference, the warrant application here did supply probable cause. The defendant was found to be driving a motor vehicle containing a large amount of marijuana and some $300,000 in cash. Deputy Robison averred that individuals involved in drug trafficking frequently use electronic devices to communicate and to track their businesses. Contrary to the defendant's argument, which portrays the incident as a "single" instance in which a lowly "mule" was stopped with some contraband, there is no evidence that he was *only* a mule. The presence of both a large amount of drugs and a large

15

amount of money suggest otherwise. In any event, the defendant's argument (that mules will not have evidence of their activity on electronic devices) is a factual one, devoid of any underlying evidentiary support.

In support of his second argument, the defendant relies on two state court decisions which do not appear to be particularly relevant to the present case, *State v. Nordlund*, 53 P.3d 520 (Wash. App. 2002), and *State v. Staley*, 548 S.W.2d 26 (Ga.App. 2001). Neither case involves drug trafficking, certainly neither involves a court authorized search of electronic devices seized from a car containing a large amount of drugs.[3]

Even if the warrant otherwise lacked probable cause, it was not so facially lacking in evidentiary support that the doctrine of the good faith exception is inapplicable. Deputy Robison supplied all the factual information in his possession. Defendant has pointed to nothing in the affidavit that was untrue or misleading. The affidavit was reviewed and approved by a state court judge. If there was error in approving the warrant, that responsibility belongs to the state court judge, not to the law enforcement officers who subsequently executed the warrant.

IT IS ACCORDINGLY ORDERED this 7th day of October, 2015, that the defendant's Motion to Suppress Evidence and Statements (Dkt. 18) is hereby denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

---

[3] Rather, both cases involve attempts to obtain search warrants for computers from a defendant's residence, where the defendant was suspected of sex-related criminal activity.

17